# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 20-1560V

|  |  |
|---|---|
| VIRGINIA LAMINE, | Chief Special Master Corcoran |
| Petitioner, | |
| v. | Filed: June 30, 2023 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Ronald Craig Homer, Conway, Homer, P.C., Boston, MA, for Petitioner.*

*Amanda Pasciuto, U.S. Department of Justice, Washington, DC, for Respondent.*

## RULING ON ENTITLEMENT[1]

On November 10, 2020, Virginia Lamine filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"), alleging that she suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine administered to her on October 14, 2018. Pet. at 1, ECF No. 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

For the reasons discussed below, I find it more likely than not that Petitioner's injury and its residual effects lasted for more than six months; that the onset of Petitioner's

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

shoulder pain occurred within 48 hours of vaccination; and that Petitioner is otherwise entitled to compensation under the Vaccine Act.

## I.   Relevant Procedural History

After initiating her claim, Petitioner filed additional records, an affidavit, and a statement of completion on November 23, 2020. ECF Nos. 6–10. On October 25, 2021, Petitioner filed additional medical records. ECF No. 18. Approximately two months later, on December 27, 2021, Respondent filed a status report indicating this case was not appropriate for compensation and requesting to file a Rule 4(c) report. ECF No. 21.

Respondent filed his Rule 4(c) report on February 24, 2022. ECF No. 22. Specifically, Respondent argued that Petitioner's medical records do not show that the onset of her pain occurred within 48 hours of vaccination. *Id.* at 8–9. Respondent further argued that Petitioner failed to establish the statutory requirement that her injury lasted for more than six months and accordingly her case should be dismissed. *Id.* at 9 (citing 42 U.S.C. § 300aa-11(c)(1)(D)(i)).

Petitioner subsequently filed a motion for a ruling on the record ("Motion") on May 24, 2022. ECF No. 23. Petitioner contends that she has met her burden of proof for a Table SIRVA claim based on the record.[3] *Id.* at 32. Specifically, she argues that she can satisfy each of the criteria set forth in the Qualifications and Aids to Interpretation ("QAI") for a Table SIRVA claim. *Id.* at 14–24. She also argues that she can satisfy the six-month severity requirement because her medical records corroborate her ongoing shoulder pain during her approximate seven-month gap in treatment. *Id.* at 24–26.

Respondent filed his response to Petitioner's motion ("Response") on July 15, 2022. ECF No. 24. He reiterated that Petitioner's main support that her pain began within 48 hours of vaccination is her affidavit, not contemporaneous medical records and she therefore cannot meet her burden for a Table SIRVA. *Id.* at 11. He maintained that Petitioner also cannot satisfy the six-month severity requirement because at the time of her discharge from PT on February 22, 2019, her pain had improved. *Id.* at 12 (citing Ex. 4 at 58–59, 302). However, Petitioner did not complain of and restart treatment for shoulder pain until September 16, 2019, approximately seven and a half months later, according to Respondent.[4] *Id.* (citing Ex. 4 at 303–08).

---

[3] Petitioner also argued that if her Table SIRVA claim is unsuccessful, she alternatively has satisfied her burden of proof for causation-in-fact and an off-Table SIRVA claim. Motion at 26–32. This Ruling will not address Petitioner's off-Table SIRVA claim or any additional arguments regarding the same.

[4] Respondent argues Petitioner had a seven-and-a-half-month gap in treatment. Resp. at 12. This appears to be incorrect, as Petitioner's gap in treatment supported by medical records spanned from February 22,

On August 1, 2022, Petitioner filed her reply ("Reply") and reiterated that she has met her burden for a Table SIRVA claim and has satisfied the six-month severity requirement. ECF No. 25. This matter is now ripe for consideration.

## II.   Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A petitioner may prevail on his claim if he has "sustained, or endured the significant aggravation of any illness, disability, injury, or condition" set forth in the Vaccine Injury Table (the "Table").  Section 11(c)(1)(C)(i). The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). If a claimant establishes that he has suffered a "Table Injury," causation is presumed.

Section 11(c)(1) also contains requirements concerning the type of vaccination received and where it was administered, the duration or significance of the injury, and the lack of any other award or settlement. *See* Section 11(c)(1)(A), (B), (D), and (E). With regard to duration, a petitioner must establish that he suffered the residual effects or complications of such illness, disability, injury, or condition for more than six months after the administration of the vaccine. Section 11(c)(1)(D).

Effective for petitions filed beginning on March 21, 2017, SIRVA is an injury listed on the Vaccine Injury Table. *See* Vaccine Injury Table: Qualifications and Aids to Interpretation.  42 C.F.R. § 100.3(c)(10). The criteria are as follows:

A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following: (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection; (ii) Pain occurs within the specified time-frame; (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and (iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

---

2019, to September 16, 2019, approximately six months and twenty-five days. I do not find Respondent's miscalculation to be detrimental to his argument, however.

*Id.*

### III.    Relevant Factual Evidence

At the time of vaccination, Petitioner was forty-one years old and employed as a dental hygienist. Ex. 1 at 3, ECF No. 6. Her prior relevant medical history includes complaints of back and bilateral shoulder pain in November of 2015, for which she underwent a breast reduction surgery. Ex. 3 at 12, 71, ECF No. 6. On October 14, 2018, Petitioner received the subject flu vaccine in her left deltoid. Ex. 1 at 1–3.

In her affidavit, signed on November 9, 2020, Petitioner noted that she recalled expressing concern regarding air bubbles in the syringe to the vaccine administrator prior to receiving the vaccination. Ex. 6 at 1, ECF No. 7. She also "remember[ed] feeling instantly sore after the vaccination." *Id.* She continued that "[her] shoulder was very sore for several days immediately following the injection, more so than . . . with any other flu shot." *Id.* at 2–3. Petitioner explained that "days turned into weeks without much relief[]" and she then realized "something more serious [was] going on . . . when range of motion [("ROM")] above [her] head caused sharp pain." *Id.* at 2. Petitioner noted that "[t]his all happened around the holidays." *Id.* She further noted having difficulties at work, as she could not use her left arm to hand instruments to the dentist like she usually did. *Id.*

More than two months post vaccination, Petitioner presented to her primary care provider ("PCP"), Advanced Practice Nurse Prescriber ("NP") Brooke Fowler, on December 28, 2018. Ex. 4 at 42–48, ECF No. 6. NP Fowler noted the chief complaint as "left shoulder pain since [O]ct[ober] 14th[, 2018]." *Id.* at 45. Petitioner reported "left shoulder pain following a flu shot . . . on [October 14, 2018]." *Id.* NP Fowler wrote that Petitioner "note[d] that her arm was very sore three days following the injections," and "[f]ollowing that, she began to notice issues when she move[d] her elbow [] above her shoulder." *Id.* She said this pain was "most noticeable with driving" and sleeping on her side. *Id.* Petitioner described her pain as "consistent in severity, 6/10[,]" sharp, but no pain at rest. *Id.* NP Fowler wrote that Petitioner "fe[lt] that the pain happen[ed] more frequently the longer she has waited" to seek treatment. *Id.* NP Fowler also noted that Petitioner's shoulder pain had "been going on for the past two and half months" and that Petitioner did not "feel that this [wa]s getting better, [but rather wa]s becoming more persistent." *Id.* at 48.

A physical exam revealed normal ROM, sensation, and strength, with left shoulder pain and mild tenderness upon certain movements. Ex. 4 at 47. NP Fowler diagnosed Petitioner with chronic left shoulder pain and opined the etiology "may be [Petitioner's] labrum or rotator cuff." *Id.* at 48. Petitioner declined a course of anti-inflammatories but

was encouraged to attend physical therapy ("PT"), apply ice, avoid placing her purse on her left shoulder, and to return if her symptoms worsened. *Id.* at 49.

Petitioner presented for an initial PT evaluation with Dr. Jessica Sigl on January 11, 2019. Ex. 4 at 292–96. Dr. Sigl wrote that Petitioner "had [a] flu vaccination on Oct[tober] 14[, 2018,] on [her] left arm. [She s]tate[d] that [her] shoulder was really sore after which is typical; however, after a week period she still noticed shoulder discomfort with putting on shirts." *Id.* at 292. Petitioner continued, "[s]ince then" she has experienced limited ROM and has not used her left arm as much due to shoulder pain. *Id.* Petitioner reported her current pain at a 2/10, with her typical pain range of 2–8/10. *Id.* Dr. Sigl wrote that Petitioner "[d]id have one morning where the arm was numb when she was laying on that shoulder, but otherwise denie[d] radicular symptoms." *Id.* Petitioner described the activities that exacerbated her pain, including driving, reaching, and sleeping on her side. *Id.* On exam, Petitioner exhibited mild limitation with active ROM, mild scapular and shoulder weakness, and left shoulder impingement. *Id.* at 293–95. Dr. Sigl assessed her with "signs and symptoms consistent with [left] shoulder impingement with rotator cuff tendonitis and possible labral pathology . . . after having [a] flu injection." *Id.* at 295. Dr. Sigl further opined that Petitioner's symptoms were consistent with an "injection [causing] location irritation [to the] surrounding tissues causing disuse and mild weakness." *Id.* She recommended that Petitioner attend one PT session per week for eight weeks. *Id.* at 296.

Petitioner attended four additional PT sessions on January 18, January 25, February 8, and February 22, 2019. Ex. 4 at 296–301. Throughout her PT treatment, Petitioner reported slight improvements of her shoulder pain. *See, e.g.*, *id.* at 297–300 (notation from January 18, 2019, reporting her shoulder pain at a 2–3/10; notation from January 25, 2019, reporting her shoulder pain at a 1–2/10; notation from February 8, 2019, reporting her shoulder pain at a 1/10). On February 22, 2019, Petitioner attended her final PT session. *Id.* at 302. She reported that her "pain ha[d] improved since [her] initial session[,]" including with driving. *Id.* Petitioner described her pain as "good" and a 1/10. *Id.* at 302–03. She also noted she had "been trying to use [her] arm like normal and notices the pain more with taking her shirt off." *Id.* at 302. Dr. Sigl suggested for the next session that Petitioner "[h]old [treatment] with [an] independent HEP [home exercise program] for [thirty] days." *Id.* Dr. Sigl wrote that Petitioner had a good understanding of the HEP "and activity modifications to avoid aggravation of [her] symptoms." *Id.* at 303. Dr. Sigl recommended Petitioner return "as needed if any [of her] symptoms progress." *Id.*

The same day, February 22, 2019, Petitioner returned to NP Fowler for her annual physical. Ex. 4 at 55. Of note, NP Fowler noted Petitioner had "[n]o health concerns" and that Petitioner "mention[ed] that her shoulder ha[d] improved with [her] recent regimen of

[PT]." *Id.* at 58. She reported exercising approximately two times per week using an elliptical and free weights at home. *Id.* at 59. Petitioner's musculoskeletal exam was normal with no abnormalities. *Id.* at 62.

Petitioner did not subsequently seek medical care generally,[5] or for her left shoulder pain specifically, until September 2019, approximately seven months later. In her affidavit, however, Petitioner maintained that she was experiencing shoulder pain during this gap in treatment. Ex. 6 at 2. She attested that following her "discharge" from PT to a HEP, she "wanted to return to seek additional care, but it was cost-prohibitive." *Id.* Petitioner indicated she supports herself and her two daughters on her dental hygienist salary. *Id.* She attested that she therefore "continued to do at-home exercises and used over-the-counter medication and ice packs." *Id.* at 2–3. When she ultimately "did not experience any relief," she presented to an orthopedic specialist in the fall of 2019. *Id.* at 3.

On September 16, 2019, Petitioner called her PCP's office to inquire about a referral to orthopedics. Ex. 4 at 81. Petitioner reported that she was "still having problems with her left shoulder" and that it "ha[d] been aching for a long time." *Id.* She noted PT did not "really help that much" and she was experiencing pain when picking things up, including soup cans. *Id.*

After receiving a referral to an orthopedic specialist, Petitioner presented to Dr. Harold Schock on September 25, 2019. Ex. 5 at 52, ECF No. 6. Dr. Schock noted that Petitioner presented with left shoulder pain and reported that "she received her flu shot in October of 2018 and started having shoulder pain right after this." *Id.* at 54. Petitioner described her clinical course, including that she experienced improvement following PT. *Id.* She continued, "[h]owever, since the flu shot[,] she has continued to have constant, aching pain." *Id.* Dr. Schock noted that Petitioner's pain was "located over the lateral and anterior aspects of the shoulder." *Id.* Petitioner indicated her pain was exacerbated by lying on her shoulder, driving, weather changes, reaching behind her back, and getting dressed. *Id.* at 54–55. On exam, Dr. Schock noted decreased ROM, 4/5 strength of the supraspinatus and strength with external rotation, tenderness to palpation over the anterior biceps tendon/rotator cuff, and pain with impingement. *Id.* at 57. Petitioner's shoulder x-ray revealed no abnormalities. *Id.* at 78. Dr. Schock assessed Petitioner with left shoulder biceps tendonitis, impingement syndrome, and rotator cuff tendonitis. *Id.* at 57. He recommended a steroid injection and a course of PT. *Id.* Petitioner declined the injection and opted to try Meloxicam, an anti-inflammatory, with PT. *Id.*

Petitioner presented to a different physical therapist, Dr. Amber Wisnicky, on October 11, 2019. Ex. 4 at 303. Dr. Wisnicky noted the date of onset of Petitioner's injury as "Oct[tober] 2018." *Id.* at 304. Specifically, Petitioner reported "she got the flu shot last

---

[5] Petitioner had a routine mammogram on March 27, 2019. Ex. 4 at 69–73.

year; had pain in her shoulder following[,]" for which she treated with PT. *Id.* Despite improvement with reaching overhead, she still had an ache in her shoulder following her original course of PT. *Id.* Petitioner explained to Dr. Wisnicky that the reason she did not return to PT despite ongoing pain was "due to financial reasons and [a] busy schedule[,]" so she "chose to try to do her exercises independently." *Id.* She indicated that she "discontinued [her HEP] at [the] start of [the] summer since she did not notice any change in symptoms since ending therapy." *Id.* Petitioner also reported that "[a]bout one week [prior to this visit], [she] moved her shoulder and had sharp pain[,]" which made it difficult to move and lift her arm. *Id.* Petitioner described pain in the anterior left shoulder and posterior and lateral area "with slight radiation toward [her] neck but [it] stops short of [her] neck." *Id.* She also "[r]ecently" noticed tingling and "some numbness on the left 5th digit[,]" mostly with driving and washing her hands. *Id.* She rated her shoulder pain intensity at a 4–5/10, with a typical range of 4–9/10. *Id.* Dr. Wisnicky recommended PT once per week for twelve weeks. *Id.* at 307.

Petitioner attended six additional PT sessions on October 18, October 23, November 6, November 15, November 22, and December 6, 2019. Ex. 4 at 308–17. Throughout this course of PT, Petitioner reported a gradual improvement in her shoulder pain. *See, e.g.*, *id.* at 308–316 (notations revealing Petitioner rated her pain at a 3/10 during her sessions throughout October of 2019, and a 1/10 during her November and December sessions). She described her shoulder pain as "dull" and "achy." *See id.* In addition to her left shoulder pain, Petitioner also continued to complain of numbness and tingling. *Id.* For example, on October 18, 2019, Petitioner reported "numbness in her 4–5 digits" especially when driving and turning to the right. *Id.* at 308–09. On October 23, 2019, Petitioner indicated her shoulder pain (rated at a 3/10) had not been waking her up at night, but that she was experiencing "numbness in her 5th and at times 4th digit[,]" which was continuing to get worse with driving, turning to the right, and reaching behind her back. *Id.* at 310. She also noted decreased coordination in her 5th digit. *Id.* Petitioner expressed these symptoms were "more of her concerns than the shoulder pain." *Id.* Dr. Wisnicky's assessment included "numbness along [the] C8 nerve root into left hand[.]" *Id.* On November 6, 2019, Petitioner reported continued shoulder achiness but that the numbness and tingling in her left arm had "significantly decreased" after she made changes to "her posture and body mechanics at work." *Id.* at 311–12. By the time of her final PT session on December 6, 2019, Petitioner did not complain of numbness or tingling but noted that she had a "dull ache in the lateral arm." *Id.* at 316. Dr. Wisnicky instructed Petitioner to continue her HEP and to return in two weeks if her "dull ache" in the shoulder continued. *Id.* at 317.

Petitioner returned to NP Fowler for her annual physical on July 1, 2020. Ex. 8 at 203, ECF No. 18. Petitioner denied any musculoskeletal complaints but reported

numbness and tingling in her left hand. *Id.* at 204. An exam of Petitioner's left shoulder revealed no abnormalities. *Id.* at 206.

In her affidavit, authored on November 9, 2020, Petitioner attested that, at that time, she "continue[d] to experience daily achiness and pain with simple every day [sic] tasks, such as[] shoveling snow, sweeping, reaching with [her] left hand . . . turning the steering wheel to the right, and lifting grocery bags." Ex. 6 at 3. She further noted occasional numbness in her left 4th and 5th digits, which causes her anxiety at work with handling sharp instruments. *Id.* Petitioner wrote she "hope[s] that someday [she] will return to baseline." *Id.*

On January 20, 2021, Petitioner returned to Dr. Schock for a second orthopedic consult for her left shoulder pain. Ex. 9 at 18, ECF No. 18. Petitioner reported she was no longer taking medication or treating for her shoulder pain. *Id.* at 23. She also reported that PT "seemed to help her motion and pain but [] she continued to have some intermittent achiness in the shoulder since." *Id.* Following x-rays and a physical exam, Dr. Schock diagnosed Petitioner with possible rotator cuff tendonitis, a possible SLAP tear, and impingement syndrome to the left shoulder. *Id.* at 25. He suggested PT and a steroid injection, but Petitioner declined at the time. *Id.* at 26. On March 10, 2021, Petitioner returned to Dr. Schock's office for a steroid injection. *Id.* at 10–11. No additional medical records have been filed.

## IV. Findings of Fact

### A. Factual Findings Regarding QAI Criteria for Table SIRVA

After a review of the entire record, I find that a preponderance of the evidence demonstrates that Petitioner has satisfied the QAI requirements for a Table SIRVA.

#### 1. Prior Condition

The first QAI requirement for a Table SIRVA is lack of a history revealing problems associated with the affected shoulder which were experienced prior to vaccination and would explain the symptoms experienced after vaccination. 42 C.F.R. § 100.3(c)(10)(i).

Respondent has not contested that Petitioner meets the first requirement under the QAI for a Table SIRVA. Additionally, I do not find any evidence that Petitioner suffered a pre-vaccination history of problems that would explain her post-vaccination shoulder symptoms.

### 2.  Onset of Pain

A petitioner alleging a SIRVA claim must also show that she experienced the first symptom or onset within 48 hours of vaccination (42 C.F.R. § 100.3(a)(XIV)(B)), and that her pain began within that same 48-hour period (42 C.F.R. § 100.3(c)(10)(ii) (QAI criteria)). Respondent argues that Petitioner is unable to meet this requirement because "the contemporaneous medical records do not establish that [she] suffered the first symptoms or manifestation of onset of a shoulder injury within forty-eight hours of her October 14, 2018 flu vaccination." Resp. at 9.

I find, however, that the totality of the record supports the conclusion that Petitioner's shoulder pain most likely began within 48 hours of receiving her October 14, 2018 flu vaccination. Thus, at her first post-vaccination medical appointment (for this is not a case with intervening records that rebut Petitioner's contentions) on December 28, 2018, Petitioner specifically complained of "[l]eft shoulder pain *since* [O]ct[ober] 14th[, 2018]." Ex. 4 at 45 (emphasis added). NP Fowler noted that Petitioner's shoulder pain had "been going on for the past two and half months," and that Petitioner did not "feel that this [wa]s getting better, [but rather wa]s becoming more persistent." *Id.* at 48. Just roughly two weeks later – at a January 11, 2019 initial PT evaluation - Petitioner again attributed her symptoms to the vaccination at issue and noted the date of onset of her injury as "Oct[ober] 14, 2018." *Id.* at 291. She stated that her shoulder was "really sore after which is typical; however, after [] a week period she still noticed shoulder discomfort with putting on shirts [and s]ince then" has experienced limited ROM. *Id.* at 292. Furthermore, the affidavit submitted by Petitioner is consistent with the evidence contained in her medical records, that her shoulder pain began immediately post vaccination, and I have found no reason not to deem such evidence credible otherwise. *See* Ex. 6 at 1–2.

Petitioner's two-and-a-half-month treatment delay does not undermine her onset assertions. Indeed, I have found *greater* delays not to have undermined an otherwise-preponderantly-established showing of two-day onset. *See, e.g., Tenneson v. Sec'y of Health & Hum. Servs.*, No. 16-1664V, 2018 WL 3083140, at *5 (Fed. Cl. Spec. Mstr. Mar. 30, 2018), *mot. for rev. denied,* 142 Fed. Cl. 329 (2019) (finding a 48-hour onset of shoulder pain despite a nearly six-month delay in seeking treatment); *Williams v. Sec'y of Health & Hum. Servs.*, No. 17-830V, 2019 WL 1040410, at *9 (Fed. Cl. Spec. Mstr. Jan. 31, 2019) (noting a delay in seeking treatment for five-and-a-half months because a petitioner underestimated the severity of her shoulder injury); *Knauss v. Sec'y of Health & Hum. Servs.*, 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018) (noting a three-month delay in seeking treatment). At most, the delay speaks to the separate issue of Petitioner's pain and suffering.

### 3.  Scope of Pain and Limited Range of Motion

The third QAI requirement for a Table SIRVA requires a petitioner's pain and reduced range of motion to be "limited to the shoulder in which the intramuscular vaccine was administered." 42 C.F.R. § 100.3(c)(10)(iii).

Respondent has not contested that Petitioner has met the third requirement under the QAI for a Table SIRVA. Additionally, I do not find any evidence that Petitioner suffered pain or reduced ROM outside of her left shoulder in which the vaccine at issue was administered. Accordingly, I find that Petitioner has met the third criterion to establish a Table SIRVA. I must note that the degree of pain and ROM issues and the hardships they imposed in this case on Petitioner appear fairly limited – a factor that will be taken into account in calculating damages.

### 4.  Other Condition or Abnormality

The last QAI criteria for a Table SIRVA states that there must be no other condition or abnormality which would explain a petitioner's current symptoms. 42 C.F.R. § 100.3(c)(10)(iv). Respondent has not contested that Petitioner meets this criterion, and there is insufficient evidence in the record to the contrary. While Petitioner complained of numbness and tingling in her left 4th and 5th digits, there is no evidence that Petitioner's treaters suspected or diagnosed her with any condition or abnormality that would explain such symptoms or link those complaints to her shoulder pain. Thus, the record contains preponderant evidence establishing that there is no other condition or abnormality which would explain the symptoms of Petitioner's left shoulder injury. I must note, however, that any alleged symptoms outside the scope of Petitioner's SIRVA should not be considered in the calculation of damages.

### B.  Severity

While Petitioner has satisfied her burden under the QAI for a Table SIRVA, the final issue to be resolved is whether Petitioner has demonstrated that she suffered "residual effects or complications of [the injury alleged] for more than six months after the administration of the vaccine," as required for eligibility under the Vaccine Program. Section 11(c)(1)(D)(i).

There appears to be no dispute that Petitioner received the flu vaccine on October 14, 2018, and she therefore must demonstrate by preponderant evidence that her residual symptoms continued for more than six months thereafter from the onset of her symptoms. *See, e.g., Herren v. Sec'y of Health & Hum. Servs.*, No. 13-100V, 2014 WL

3889070, at *2 (Fed. Cl. Spec. Mstr. July 18, 2014); *see also Hinnefeld v. Sec'y of Health & Hum. Servs.*, No. 11-328V, 2012 WL 1608839, at *4–5 (Fed. Cl. Spec. Mstr. Mar. 30, 2012) (dismissing case where medical history revealed that petitioner's Guillain-Barré syndrome resolved less than two months after onset).

To satisfy the six-month requirement, "[a] potential petitioner must do something more than merely submit a petition and an affidavit parroting the words of the statute." *Faup v. Sec'y of Health & Hum. Servs.,* No. 12-87V, 2015 WL 443802, at *4 (Fed. Cl. Spec. Mstr. Jan. 13, 2015). Rather, a petitioner is required to "submit supporting documentation which reasonably demonstrates that the alleged injury or its sequelae lasted more than six months[.]" *Id.* Although a petitioner cannot establish the length or ongoing nature of an injury merely through self-assertion, the fact that a petitioner has been discharged from medical care before the expiration of the six-month period does not necessarily indicate that there are no remaining or residual effects from his or her alleged injury. *See, e.g.*, *Herren,* 2014 WL 3889070, at *3 (finding that a petitioner suffered from residual symptoms that due to their mild nature did not require medical care).

As discussed above, Petitioner's treatment records and affidavit suggest that the onset of her symptoms began within 48 hours of her October 14, 2018 flu vaccination – or by no later than October 16, 2018. Therefore, she logically must demonstrate that her left shoulder injury was extant as of April 16, 2019.

Petitioner initially sought treatment for her shoulder injury on December 28, 2018, and continued until her discharge from PT on February 22, 2019, approximately four months post onset. Respondent thus maintains that this record suggests recovery before the April 2019 six-month "deadline." Indeed, Respondent notes, Petitioner's PT and PCP records from the February 2019 treatment event reveal that her shoulder pain had improved by that date, with a "self-reported pain level" of 1/10 and a normal physical exam. Resp. at 9 (citing Ex. 4 at 58–59, 62, 302). And thereafter, there was a nearly seven-month gap in treatment between her discharge from PT on February 22, 2019, and her return to care on September 16, 2019.

Despite these undisputed facts, the record also reveals that Petitioner's symptoms *did* continue – even after February 2019. At the time of Petitioner's discharge from PT on February 22, 2019, Petitioner's physical therapist, Dr. Sigl, memorialized the fact that Petitioner was still "notic[ing] the pain more with taking her shirt off." Ex. 4 at 302. Dr. Sigl thus told Petitioner to continue her HEP independently for the next thirty days (until approximately March 24, 2019,) and to return "if any symptoms progress[ed]." *Id.* at 302–03. This record undermines Respondent's contention that Petitioner's symptoms had now resolved (even if they had unquestionably improved).

11

Additionally, the record shows that Petitioner continued her HEP for more than the prescribed thirty days (thus past March 24, 2019). Petitioner's affidavit also establishes that following her discharge from PT, she continued her HEP (as well as other home remedies such as over-the-counter medications and ice packs) without success up until she "ultimately" sought continued care in the fall of 2019. Ex. 6 at 2–3. It is true that Petitioner's affidavit is not specific regarding how long she continued her HEP. *See id.* But the medical records provide some context for the timeline provided in her affidavit. Petitioner's October 11, 2019 PT record, for example, indicates that she "discontinued [her HEP] at [the] start of summer since she did not notice any change in symptoms since ending therapy." Ex. 4 at 304. This would, at worst, place the cessation of her injury past April 16, 2019.

Furthermore, Petitioner's explanation for why she did not return for treatment during the nearly seven-month period, despite the existence of pain, was persuasive and supported by the record. Petitioner told her treater on October 11, 2019, that despite still having an ache in her shoulder following her discharge from PT in February of 2019, "due to financial reasons and [a] busy schedule[,] she chose to try to do her exercises independently." Ex. 4 at 304. When she failed to notice relief, she even discontinued her HEP. *See id.* Petitioner's affidavit corroborates the notation in her medical record and provides further explanation for why it was cost prohibitive to seek medical treatment during the February – September 2019 gap. *See generally* Ex. 6. And her explanation is bolstered by the fact that Petitioner is a single mother of two daughters and therefore reasonably cannot afford additional expenses and PT on a dental hygienist's salary. *Id.* at 2.

Otherwise, the lack of evidence of continuous treatment does not prevent a finding that severity of injury persisted beyond six months of onset. *See, e.g., Herren*, 2014 WL 3889070, at *3. The record clearly establishes that Petitioner opted for self-care (HEP, over-the-counter medication, and ice packs) during much of this period, based on the recommendations she received from her physical therapist at her time of discharge in February 2019 and due to her own personal circumstances. Ex. 4 at 302; Ex. 6. Petitioner's statements in her affidavit do not contradict the records themselves, but provide additional context of time and circumstances that lead to her decision to forego formal treatment for nearly seven months. *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1384 (Fed. Cir. 2021).

Finally, Petitioner's fall 2019 medical records confirm the existence of ongoing sequelae. When Petitioner called her PCP's office seeking a referral to orthopedics for her shoulder pain on September 16, 2019, she reported that she was "still having problems with her left shoulder." Ex. 4 at 81. She also stated it had "been aching for a

long time." *Id.* When Petitioner established orthopedic care on September 25, 2019, she reported that she "received her flu shot in October of 2018 and started having shoulder pain right after this," adding that it had persisted since. Ex. 5 at 54. I have no reason to doubt the accuracy of these records, and I find Petitioner's reports to medical treaters worthy of appropriate weight. *See Cucuras,* 993 F.2d at 1528 (finding medical records warrant consideration as trustworthy evidence as they are "generally contemporaneous to the medical events," and "accuracy has an extra premium" because a patient's "proper treatment is hanging in the balance.").

Thus, after consideration of the entire record, the evidence supports a finding that severity has been met. (Certainly, however, the treatment gap plus Petitioner's comfort at self-directed treatment efforts all underscore that this is a mild SIRVA that did not require surgery – and any damages that may be awarded in this case will take such factors into account).

### C.  Other Requirements for Entitlement

Based on the above, I find that Petitioner has satisfied all requirements for a Table SIRVA and is entitled to a presumption of causation. However, even if a petitioner has satisfied the requirements of a Table injury or established causation-in-fact, he or she must also provide preponderant evidence of the additional requirements of Section 11(c). The overall record contains preponderant evidence to fulfill these additional requirements.

The record shows that Petitioner received a flu vaccine intramuscularly in her left shoulder on October 14, 2018, in Wisconsin. Ex. 1 at 3; *see* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i)(I) (requiring administration within the United States or its territories). There is no evidence that Petitioner has collected a civil award for his injury. Ex. 7, ECF No. 7; Section 11(c)(1)(E) (lack of prior civil award). Additionally, as stated above, I have found that Petitioner suffered the residual effects of her shoulder injury for more than six months. *See* Section 11(c)(1)(D)(i) (statutory six-month requirement).

Thus, based upon all of the above, Petitioner has established that she suffered a Table SIRVA – albeit a limited and fairly mild case. Additionally, she has satisfied all other requirements for compensation.[6] I therefore find that Petitioner is entitled to compensation in this case.

---

[6] Because I have found that Petitioner has demonstrated a Table injury, there is no need to address Petitioner's "causation-in-fact" allegation.

## D.  Conclusion

Based on the entire record, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table SIRVA and the Vaccine Act's severity requirement for both Table and non-Table claims. Petitioner is entitled to compensation in this case. A subsequent order will set further proceedings towards resolving damages. (I reiterate my earlier points, however, that this case is not one in which a large pain and suffering award (even approaching $50,000.00) is called for, and therefore Petitioner must factor in the overall mild nature of the injury in seeking damages). **Thus, Petitioner's Motion, ECF No. 23, is GRANTED.**

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master